```
           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND


L'OCCITANE, INC.              *
                              *
v.                            *
                              *   Civil Action No. WMN-09-2499
TRAN SOURCE LOGISTICS, INC.   *
     et al.                   *
                              *
  *    *    *    *    *    *    *    *    *    *    *    *    *    *
```

**MEMORANDUM**

Before the Court are the following motions: motion to strike the Third Party Complaint, filed by Plaintiff L'Occitane Inc. (L'Occitane), Paper No. 37; a motion to dismiss Defendants' Counterclaim, also filed by L'Occitane, Paper No. 38; and a motion to dismiss the Third Party Complaint filed by Third Party Defendant AFC Worldwide Express, Inc. (AFC), Paper No. 51.  The two motions filed by L'Occitane are ripe.  Upon review of the pleadings and the applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that L'Occitane's motions will both be granted and that AFC's motion will be denied as moot.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff L'Occitane is engaged in the distribution and sale of cosmetics and fragrance products.  Defendant Tran Source Logistics, Inc. (TSL) offers transportation management services. Defendant Howard Cates is the president of TSL.  Third Party

Defendant AFC is engaged in the business of providing freight services.

At all times relevant to this action, TSL and L'Occitane were parties to a contract whereby TSL agreed to serve as a conduit between L'Occitane and several of L'Occitane's third party vendors, including AFC. Pursuant to that agreement, TSL would forward invoices from these third party vendors to L'Occitane, L'Occitane would wire funds to TSL to cover the invoices, and TSL was to forward the payments to the vendors. For providing these services, TSL received a monthly fee from L'Occitane.

Between March 2009 and July 2009, L'Occitane used TSL conduit services to facilitate shipping services provided by AFC. According to the Complaint, L'Occitane wired amounts to TSL to pay the invoices submitted during that period but TSL wrongly retained approximately $160,000[1] that should have been passed on to AFC. L'Occitane alleges in its Complaint that "Mr. Cates withheld the funds, as a result of a personal dispute between Mr. Cates and AFC about a matter to which L'Occitane was

---

[1] L'Occitane states in the Complaint that TSL failed to forward $217,968.22 owed to AFC, but also concedes that TSL may have passed through a "relatively small amount" of the withheld funds shortly before the Complaint was filed. Compl. ¶ 20. In the current pleadings, L'Occitane is asserting that TSL has failed to pass on "more than $160,000" to AFC. See, e.g., Mot. to Strike at 2.

2

not privy." Compl. ¶ 21. When payment was not forwarded, AFC took steps to recover the funds directly from L'Occitane and also held certain goods belonging to L'Occitane pending payment.

L'Occitane filed the instant suit against TSL on September 23, 2009. On October 15, 2009, TSL filed a motion to dismiss the Complaint and among the grounds for dismissal was TSL's assertion that AFC was a necessary and indispensable party to this action and in its absence, the Complaint should be dismissed. The Court denied the motion to dismiss, finding that AFC was not an indispensable party in this action.

On December 11, 2009, TLC filed a third party complaint against AFC. Paper No. 34. In the Third Party Complaint, TSL alleges the existence of a separate "Commission Sales Agreement" between TSL and AFC whereby AFC agreed to pay TSL a commission of 2.5% on all gross collected revenue from L'Occitane to TSL. Third Party Complaint (TPC) at ¶ 8. According to the Third Party Complaint, TSL was due over $65,000 in unpaid commissions under this agreement with AFC. Id. ¶ 10.[2] The Third Party Complaint contains three counts: Count I asserts a breach of the commission contract; Count II brings a claim of unjust enrichment based upon the unpaid commissions; and Count III attempts to bring a claim for indemnification based on the

---

[2] The Court can reasonably surmise that this dispute over commissions was the "personal dispute" between Cates and AFC that L'Occitane alluded to in its Complaint. Compl. ¶ 21.

3

allegation that L'Occitane's damages "arise solely as the result of the actions of AFC in withholding L'Occitane property and taking action against [L'Occitane] to recover certain monies." TPC ¶ 26 (emphasis added).

Also on December 11, 2009, TSL filed its answer to the Complaint along with a counterclaim against L'Occitane. The Counterclaim brings a single count of tortious interference with contract in which TSL alleges that L'Occitane has interfered with the Commission Sales Agreement between TSL and AFC. Specifically, TSL points to a May 27, 2009, "Transition Agreement" which TSL characterizes as an agreement on the part of L'Occitane "to pay AFC monies owed directly." Countercl. ¶ 2.[3] By agreeing to pay AFC directly, TSL maintains that "L'Occitane obscured from TSL monies paid to AFC of which a commission was owed to TSL." Id. ¶ 3.

For the reasons that follow, the Court concludes that the counterclaim fails to state a valid claim and should be dismissed and that the Third Party Complaint does not assert a proper third party claim and should be stricken.

---

[3] TSL represents that it was attaching the "Transition Agreement" as an exhibit to the Counterclaim. Id. It was not attached but L'Occitane supplied a copy with its motion to dismiss. Mot. to Dismiss Counterclaim, Ex. A.

4

**II. MOTION TO DISMISS COUNTERCLAIM**

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, --- U.S. ----, ----, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556). "Detailed factual allegations" are not required, but allegations must be more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action[.]" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 555). "[O]nce a claim has been stated adequately," however, "it may be supported by showing any set of facts consistent with the allegations in the complaint." Twombly, 550 U.S. at 563. In considering such a motion, the court is required to accept as true all well-pled allegations in the Complaint, and to construe the facts and reasonable inferences from those facts in the light most favorable to the plaintiff. Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997).

For TSL to establish its counterclaim against L'Occitane for tortious interference with TSL's contractual relationship

5

with AFC, TSL would need to establish the following elements: (1) the existence of a contract between TSL and AFC; (2) L'Occitane's knowledge of that contract; (3) L'Occitane's intentional interference with that contract; (4) a breach of the contract by AFC; and (5) resulting damage to TSL. See havePOWER, LLC v. General Elec. Co., 183 F. Supp. 2d 779 (D. Md. 2002) (applying Maryland law).[4] "In order to prove the third element of the tort, [TSL] must prove that '[L'Occitanes] interference was wrongful and without justification.'" Id. (quoting Sharrow v. State Farm Mut. Auto. Ins. Co., 511 A.2d 494, 498 (Md. 1986)). The Counterclaim fails to sufficiently allege at least two of those elements, the second and the third.

Nowhere in the Counterclaim does TSL specifically allege that L'Occitane had any knowledge of the Commission Sale Agreement. One could perhaps infer such knowledge from TSL's allegation that "L'Occitane purposefully intended to harm this contractual relationship," Counterclaim ¶ 6, but TSL provides no factual support for that inference. In opposing the motion to dismiss, TSL cites as proof of L'Occitane's knowledge the fact that the contract is "repeatedly mentioned in L'Occitane's pleadings, albeit derogatorily referred to as a 'kickback' agreement." Opp'n at 5. Of course, this is only evidence of

---

[4] The parties agree that Maryland law is applicable to this claim. See Mot. to Dismiss at 6 n.3 and Opp'n to Mot. to Dismiss at 4 (citing Maryland case law).

6

L'Occitane's knowledge of the commission contract gained after TSL filed the Counterclaim.  Given that L'Occitane consistently refers to this commission contract as an illegal kickback arrangement, the reasonable inference is that L'Occitane was unaware that TSL was being compensated not only by L'Occitane for arranging transportation contracts, but also by the vendors.

Regardless of whether TSL has sufficiently alleged timely knowledge of the contract on the part of L'Occitane, TSL has failed to allege sufficient facts upon which one could reach a plausible conclusion that L'Occitane interfered with that contract.  As noted above, the factual support offered by TSL for the proposition that L'Occitane interfered with the commission agreement was a May 27, 2009, "Transition Agreement" between L'Occitane and AFC.  TSL claims that under this agreement L'Occitane agreed to pay AFC directly, thereby robbing TSL of its commissions.  While TSL failed to attach this document to its Counterclaim, as it represented that it would, L'Occitane has supplied the document in question.  A review of the document clearly reveals that it does not, as TSL claims, provide for direct payments from L'Occitane to AFC.  See Mot., Ex. A.[5]  The agreement simply provides for L'Occitane's "smooth transition away from AFC" to another freight forwarder.  Id.

---

[5] Because TSL references and relies upon this document in the Counterclaim, the Court can consider this document in ruling on

7

Because TSL misrepresents the substance of the Transition Agreement, it makes no argument that L'Occitane's transitioning from AFC to another freight forwarder is somehow "wrongful or without justification," nor could it.  L'Occitane clearly has a right to change its freight carrier and that decision, regardless of the fact that it might deprive TSL of future commissions, cannot form the basis of an intentional interference claim.  "[U]nder Maryland law, one who, regardless of motive, causes harm to another merely by refusing to continue a business relationship terminable at will is not liable for that harm."  PPM America, Inc. v. Marriott Corp., 853 F. Supp. 860, 879 (D. Md. 1994).

**III. MOTION TO STRIKE THIRD PARTY COMPLAINT**

In asserting its third party complaint against AFC, TSL relies on Rule 14(a)(1) of the Federal Rule of Civil Procedure.  See TPC Preamble.  Under Rule 14(a)(1), a "defending party may, as a third party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claims against it."  "It is settled beyond dispute that a third party claim can be maintained only if the liability it asserts is in some way derivative of the main claim."  Watergate Landmark Condominium Unit Owners' Assoc. v. Wiss, Janey, Elstner

---

this motion to dismiss.  Fare Deals Ltd. v. World Choice Travel.com, Inc., 180 F. Supp. 2d 678, 683 (D. Md. 2001).

Assoc., Inc., 117 F.R.D. 576, 578 (E.D. Va. 1987). "Typically, proper third party claims involve one joint tortfeasor impleading another, an indemnitee impleading an indemnitor, or a secondarily liable party impleading one who is primarily liable. Absent such derivative liability, a third party claim must fail." Id.

Courts have also cautioned that, "a third party claim is not appropriate where the defendant and putative third party plaintiff says, in effect, 'It was him, not me.' Such a claim is viable only where a proposed third party plaintiff says, . . . 'If I am liable to plaintiff, then my liability is only technical or secondary or partial, and the third party defendant is derivatively liable and must reimburse me for all or part . . . of anything I must pay plaintiff.'" Id. Furthermore, "Rule 14(a) does not allow the defendant to assert a separate and independent claim even though the claim arises out of the same general set of facts as the main claim." Laughlin v. Dell Financial Servs., L.P., 465 F. Supp. 2d 563, 567 (D.S.C. 2006); see also Watergate Landmark, 117 F.R.D. at 578 ("[Rule 14] cannot be used as a device to bring into a controversy matters which merely happen to have some relationship to the original action.").

TSL makes no claim that Counts I or II of the Third Party Complaint involve any kind of derivative or secondary liability,

9

nor could it. It is undisputed that claims asserted in these counts arise solely out of the Commission Sales Agreement, a completely separate contract from the contract that gave rise to the claims in L'Occitane's Complaint. To justify its insertion of these claims into this action, TSL relies exclusively on Count III, arguing that this count asserts a proper claim for indemnification and that Counts I and II can be brought along as related claims. Opp'n at 3. The Court concludes, however, that Count III does not assert a proper claim for indemnification.

Under Maryland law,[6] the right for one party to seek indemnification from another person or entity may arise in three types of circumstances; (1) indemnification can be expressed by contract; (2) it can be implied by law; or (3) it can be implied in fact "from a special relationship between the parties, usually contractual in nature, or from a course of conduct." Pulte Home Corp. v. Parex, Inc., 942 A.2d 722, 730 (Md. 2008). TSL concedes that it cannot assert a claim for indemnification by express contract or by implication of law. Opp'n at 4.

---

[6] While federal law provides the procedures to be used in an impleader action, in a diversity action courts look to state law for the requisite right of indemnification. Kenrose Mfg. Co., Inc. v. Fred Whitaker Co., Inc., 512 F.2d 890, 892 n.1 (4th Cir. 1972). Because the alleged actions and events that give rise to the Third Party Complaint are alleged to have occurred in Maryland, the parties agree that Maryland law governs. Mot. at 7 n.3; Opp'n at 4.

Instead, TSL claims that the "relationship between TSL and AFC is . . . a special relationship providing for an implied right to indemnification." Id.

TSL's identification of that "special relationship" is somewhat strained. TSL asserts that, as a freight forwarder, AFC had an obligation to forward items that it accepted for shipment to the end-recipients. That duty to forward cargo, TSL contends, "is implied in any contract [AFC] enters to provide its services." Opp'n at 5. Asserting that L'Occitane's alleged damages arose as a result of losses stemming from AFC refusal to forward cargo, TSL argues that, "[h]ad AFC forwarded L'Occitane's cargo, as was its duty pursuant to its special relationship with TSL, L'Occitane would have suffered no damages." Id.

As L'Occitane correctly observes, TSL's indemnification theory is premised on an inaccurate characterization of the Complaint. While the Complaint mentions some incidental damages that L'Occitane incurred because of AFC's holding of certain goods pending payment, the principal damages referenced in the Complaint were the more than $160,000[7] improperly withheld by TSL from AFC. As TSL completely ignores those damages in opposing

---

[7] See footnote 1.

the motion to strike, it makes no argument that it could have an indemnity claim against AFC related to those damages.

The Court also finds that there are insufficient allegations in the Third Party Complaint to support the finding of a "special relationship" that would give rise to an indemnity claim, even as to those incidental damages caused by AFC's brief and temporary[8] refusal to forward cargo. "[A] contractual right to indemnification will only be implied when there are unique special factors demonstrating that the parties intended that the would-be indemnitor bear the ultimate responsibility . . . or when there is a generally recognized special relationship between the parties." The only contract between TSL and AFC identified in the Third Party Complaint is the Commission Sales Agreement which, of course, does not even relate to the damages alleged in the Complaint, much less give rise to a special relationship that would imply a right to indemnification for those damages. The duty to forward freight arises out of a relationship between L'Occitane and AFC, not TSL and AFC.[9]

---

[8] TSL reports in its Third Party Complaint that Defendant Cates was informed on October 9, 2009, that L'Occitane and AFC had settled their dispute, TPC ¶ 14, and apparently was no longer withholding delivery. See also id. ¶ 15 (alleging, upon information and belief, that AFC was continuing to provide freight forwarding services to L'Occitane).

[9] Throughout the Complaint, AFC is described as vendor of L'Occitane. See Compl. ¶ 18 ("AFC provided shipping services for L'Occitane"); see also id. ¶¶ 8, 9 (describing entities such

12

Even were the Court to find some viable indemnification theory in the Third Party Complaint relevant to the incidental damages alleged in the Complaint, the Court would, nonetheless, in its discretion, strike the Third Party Complaint. "[W]hether to permit [a] third-party claim to remain in [a] lawsuit is a matter left to the sound discretion of the district court. Dishong v. Peabody Corp., 219 F.R.D. 382, 385 (E.D. Va. 2003). In exercising that discretion, courts have recognized that where bringing in the third party will introduce unrelated issues and unduly complicate the original suit, impleader may be denied. Id.; see also, United States Fid. & Guar. Co. v. Perkins, 388 F.2d 771, 773 (10th Cir. 1968) ("If impleading a third party defendant would require the trial of issues not involved in the controversy between the original parties without serving any convenience, there is no good reason to permit the third-party complaint to be filed.").

L'Occitane's Complaint involves a straightforward claim that TSL breached its contract with L'Occitane when it failed to forward $160,000 to AFC that was sent to TSL to cover AFC's invoices. TSL's Third Party Complaint involves a claim for over $65,000 in commissions that it alleges are due under a completely separate contract between TSL and AFC. Those

---

as AFC as "L'Occitane's third-party vendors"). In the Third Party Complaint, TSL describes its role as simply "bringing L'Occitane and AFC together." TPC ¶ 8.

commissions have no legal connection to L'Occitane's claims and the inclusion of evidence related to that separate contract could only prolong these proceedings and potentially confuse the finder of fact.

**IV. CONCLUSION**

For these reasons, the Court will grant L'Occitane's motion to strike the Third Party Complaint and to dismiss the Counterclaim. Since the Third Party Complaint will be struck pursuant to L'Occitane's motion to strike, AFC's motion to dismiss the Third Party Complaint will be denied as moot. A separate order will issue.

                                    _____/s/_____
                                    William M. Nickerson
                                    Senior United States District Judge

DATED: March 2, 2010